ZLOTNICK, Albert M., individually and on behalf of all others similarly situated, Appellant,

v.

TIE COMMUNICATIONS & L.W. Kifer.

No. 87–1370.

United States Court of Appeals, Third Circuit.

Argued Dec. 7, 1987.

Decided Jan. 6, 1988.

As Corrected Jan. 14, 1988.

Donald B. Lewis (argued), Philadelphia, Pa., for appellant.

Edward J. Yodowitz (argued), Skadden, Arps, Slate, Meagher & Flom, New York City, and David H. Pittinsky, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for appellees.

Before GREENBERG, SCIRICA, and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Appellant Albert Zlotnick filed this class action against Appellees TIE Communica-

tions, Inc. ("TIE") and L.W. Kifer, alleging violations of §§ 9 and 10(b) of the Securities Exchange Act of 1934 and of the RICO Act. Zlotnick claims that appellees' misrepresentations artificially inflated the price of a stock which he had sold short, causing him to lose money when he made the purchase necessary to cover the short sale. The District Court dismissed for failure to state a claim, 665 F.Supp. 397. Zlotnick now seeks a reversal and the reinstatement of his complaint.

## I. BACKGROUND

### A. The Allegations

In reviewing a dismissal under Fed.R. Civ.P. 12(b)(6), the court must accept as true both the factual allegations contained in the complaint and all the reasonable inferences that can be drawn from those allegations. *Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 273 (3d Cir.1985). We therefore accept the facts as presented in Zlotnick's allegations.

In 1981, appellees TIE and Kifer formed Technicom International, Inc. ("Technicom"), a manufacturer of systems to monitor and control the moisture level of communication cables. At all relevant times in this case, TIE was the parent of Technicom and owned a majority of its stock, and Kifer was the Chairman and CEO of Technicom and held a significant equity interest in the company. In March, 1982, TIE and Technicom entered into a "distribution agreement" whereby each would distribute the products of the other. Shortly thereafter, Technicom made a public offering of its common stock, selling approximately 625,000 shares at a price of $9.75 per share. The price of Technicom stock rose steadily throughout 1982, selling at six times its offering price by the end of the year.

On January 6, 1983, Zlotnick sold short 1,000 shares of Technicom at $16.875 per share. Five days later he sold short another 1,000 shares at an average price of $19.30. Zlotnick sold the stock short because he concluded that the stock was over-

valued. He based this conclusion in part on his analysis of the company's earnings and prospects, finding that the stock was then selling at a ratio of approximately 50 times current annualized earnings. Zlotnick also based his conclusion on his belief that Technicom faced increasing competition that would diminish its profit margins and depress future earnings. At the time of his short sale Zlotnick was unaware of any wrongdoing or misrepresentations by appellees; and he did not base his decision to sell short on a belief that appellees were deceiving investors.

In early 1983, subsequent to Zlotnick's short sales, appellees undertook to inflate artificially the price of Technicom stock. Specifically, TIE and Kifer caused Technicom to issue several press releases which misrepresented the company's sales agreements and earnings prospects. They also caused Technicom to engage in illusory sales to TIE. Both misrepresentations falsely inflated the company's reported sales and earnings for the fourth quarter and entire fiscal year of 1982 to record levels. By March 14, 1983, the price of Technicom stock had risen to approximately $33.00 per share. Zlotnick, unaware of any deceptive practices by appellees, decided to cut his losses by making the purchases necessary to cover his short position; ultimately, he realized a loss of about $35,-000.

The price of Technicom stock did not begin to fall until the summer of 1983. Thereafter, due in part to more realistic statements by Technicom, the value of the stock dropped sharply. On June 30, 1984, the stock was trading at $4.12 per share. Following further reported losses, Technicom merged with its parent TIE via a transaction in which Technicom stockholders received .29 shares of TIE stock for every share of Technicom; the value to shareholders of this transaction was approximately $2.50 per share of Technicom. This represented a drop in value of approximately 90% from the high of the previous year.[1]

---

1. The stock prices for dates after Zlotnick's covering purchase reflect a stock split. Technicom

split its stock both before Zlotnick's short sale and after his covering purchase, but as there

Zlotnick instituted this action on March 13, 1985 by filing a complaint on behalf of himself and all similarly situated investors. The complaint was amended on June 6, 1985. Appellees moved for dismissal on September 16, 1985; and after requesting further briefing on the fraud-on-the-market theory, the District Court dismissed the amended complaint on June 23, 1987. In the meantime, this court had explicitly adopted the fraud-on-the-market theory in *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986). The District Court, accepting this court's decision in *Peil*, nonetheless held that Zlotnick had not sufficiently alleged reliance on appellees' deception, and therefore had not stated a claim upon which relief could be granted. Zlotnick filed a notice of appeal on June 26, 1987.

## B. Short Selling

■ Because this case turns to some extent on the nature of short selling as an investment strategy, we set out here our understanding of that process. Where the traditional investor seeks to profit by trading a stock the value of which he expects to rise, the short seller seeks to profit by trading stocks which he expects to decline in value. A typical short seller expects decline because, based on his view of the underlying strengths and weaknesses of a business, he concludes that the market overvalues the business' stock. As demonstrated by the allegations, these underlying facts can concern the present—such as the fact that a stock trades at fifty times its earnings—or they can concern the future— such as the fact that a business will face increased competition.[2]

Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk. There is no time limit on this obligation to cover.

"Selling short," therefore, actually involves two separate transactions: the short sale itself and the subsequent covering purchase. We reject appellees' suggestion that the two components of selling short be considered one transaction.[3] When the short seller transfers borrowed stock to a buyer, its obligations to that buyer are ended. His only obligation is an open-ended one to the person who loaned him the stock. A short seller's default on this obligation will not affect the prior transfer. Also, the short seller exercises real discretion in choosing when to purchase shares, and this latter transaction actually deter-

was no stock split while Zlotnick held his short position, these splits do not affect this case.

**2.** The expectation of decline in a business' earnings due to increased competition in the future is a statement that the stock is currently overvalued. A perfect market would discount the price of the stock to reflect any future decline.

**3.** Determining whether a short sale and covering purchase constitutes one transaction or two is important to the disposition of this case. The District Court seemed to accept the single-trans-

action characterization of short selling. Based at least in part on that premise, it decided that since there was no demonstrated reliance prior to the original short sale (as opposed to what happened after the sale but before the purchase), Zlotnick could not state a claim under § 10(b). *See* Memorandum Opinion 665 F.Supp. at 399. Since we view the covering purchase as a second, independent transaction, we must determine whether Zlotnick sufficiently alleges reliance upon appellees' misrepresentations for that transaction.

mines his profit or loss.[4] Thus, this investment, like most investments, involves two transactions: a purchase and a sale. That the sale occurs "before" the purchase does not affect our consideration of each separate transaction for the possible effects of fraud.

## II. STANDING

■ Appellees challenge Zlotnick's standing to bring suit under the securities laws. They claim that since Zlotnick, in effect, sold his stock before he purchased it, he never owned any Technicom stock. Therefore, they argue, he has no standing under the Supreme Court's ruling in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Appellees also seek to distinguish the short seller from the traditional investor, arguing that while the traditional investor hopes to profit from the company's good fortune, the short seller gains his profit from the company's decline. In effect, the short seller "bets against" the company, and so should not be treated as an investor in it. Appellees also analogize the short seller to the options trader, whom several courts have found unprotected by the anti-fraud provisions of the securities acts. *See, e.g., Starkman v. Warner Communications, Inc.*, 671 F.Supp. 297 (S.D.N.Y.1987).

Appellees' standing arguments are without merit. In *Blue Chip Stamps*, the Supreme Court limited the class of potential plaintiffs under § 10(b) to those who actually purchased or sold securities. Here, Zlotnick did both: he sold shares short, and he purchased shares later to cover that short sale. Therefore, he meets the technical standing requirements of the securities laws. The Court in *Blue Chip Stamps* noted that requiring a plaintiff to have actually purchased or sold stock to have standing may result in arbitrary distinctions. 421 U.S. at 738–39, 95 S.Ct. at 1926–27. Moreover, any similarity between the investment strategies of a short seller and an options trader is irrelevant where the difference between the two investors is that the former actually purchases securities while the latter does not. Therefore, the argument by analogy to options sellers, whether or not the latter are covered by the statutes, must also fail. In accordance with *Blue Chip Stamps*, this court will not look past the standing requirements and examine the reasons for an investment decision. We hold that a short seller has standing to sue under the antifraud provisions of the securities laws.

## III. THE § 10(b) CLAIM

In order to state a claim under § 10(b) and Rule 10b–5, a plaintiff must plead the following elements:

1) a false representation of 2) a material 3) fact; 4) defendant's knowledge of its falsity and his intention that plaintiff rely on it [although recklessness, as opposed to actual intent, will suffice]; 5) the plaintiff's reasonable reliance thereon; and 6) his resultant loss.

*Peil v. Speiser*, 806 F.2d 1154, 1160 & n. 9 (3d Cir.1986) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.), *cert. denied sub nom. Wasserstrom v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); 3 Loss, *Securities Regulation* 1431 (1961)). The District Court dismissed the complaint in this case because it found Zlotnick's amended complaint did not meet this requirement of pleading reliance. This is the sole issue on appeal.

### A. Fraud on the Market

■ Zlotnick asks this court to presume reliance because defendants have committed a "fraud on the market." In *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986), this court accepted that the showing of a "fraud on the market" may create a rebuttable presumption of reliance in favor of the plaintiff in certain cases. Where the purchaser of a stock shows he purchased in an "open and developed market" and that defendant has made a material misrepre-

---

**4.** As the short seller's decision to cover determines the extent of his profit or loss, even if this court were to consider Zlotnick's investment as a single transaction, it is unclear when we should consider this single transaction to have occurred.

sentation, this court "will presume that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock." *Id.* at 1161. While we will allow Zlotnick the opportunity to prove his reliance, based on the allegations in his complaint, we decline to presume it.

Underlying the presumption of reliance we made in *Peil* is a theory of indirect actual reliance. The purchaser relies on the market price of the stock as an indication of its value. *Id.* at 1160. In other words, the market price of the stock is itself a representation on which a purchaser may rely. Because the market price has been infected by fraud, that price is—at least to the extent it is artificially inflated—a misrepresentation. *Compare, In re Associated Securities Corp.*, 40 S.E.C. 10, 14 (1960) (price not reasonably related to value is fraudulent), *aff'd*, 293 F.2d 738 (10th Cir.1961). Though "the market" actually sets the improper price, the defendant has participated in the setting of the price by making false statements in order to affect that price. Thus, the purchaser has in fact relied on the false statement of the defendant, if indirectly.[5] In *Peil*, we accepted this theory of reliance, and shifted to the defendant the burden of disproving such reliance.

The fraud-on-the-market theory creates a threefold presumption of indirect reliance. First, this court presumes that the misrepresentation affected the market price. Second, it presumes that a purchaser did in fact rely on the price of the stock as indicative of its value. Third, it presumes the reasonableness of that reliance. All of these presumptions are necessary to establish actual reliance. The first presumption is necessary to find that a misrepresentation was in fact made to the purchaser. Thus, if defendant rebuts this presumption by showing that the market did not respond to the misrepresentation, it does no more than show that the market price was not misrepresentative, and thus that no misrepresentation was made to the purchaser of the stock. The second presumption is necessary for a court to find that the plaintiff did in fact rely on the misrepresentation. Thus, a defendant may rebut this presumption by showing that the plaintiff would have purchased even if he had known about the misrepresentation. The final presumption, that reliance on the market price is reasonable, may be rebutted by showing that the plaintiff knows that a representation is false. If the plaintiff knows of a misrepresentation, he has reason to believe that the market price has been affected by it. In such a case, this court will not presume his reliance on that price reasonable.[6]

This court will presume reliance only where it is "'logical to do so.'" *Peil*, 806 F.2d at 1161 n. 11 (quoting *Sharp v. Coopers and Lybrand*, 649 F.2d 175, 188 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982)). We do not find it logical in this case to make any of the presumptions discussed above. In *Peil*, we presumed that the market price reflected defendant's misrepresentation because we found that an open and developed market likely reflects all available information.[7] Here, Zlotnick sold short because he

---

**5.** *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *In re LTV Securities Litigation*, 88 F.R.D. 134, 143 (N.D.Tex.1980). *See also Panzirer v. Wolf*, 663 F.2d 365, 367 (2d Cir.1981) (plaintiff's reliance on article in Wall Street Journal, which was based on defendant's misrepresentations, sufficient), *cert. denied*, 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982).

**6.** It may be argued that this defense is improper in a case such as this because, once he had sold short, knowing of the misrepresentation would not have been of any use to Zlotnick. Until *the market* knew of the fraud and consequently

lowered the price of Technicom stock, Zlotnick would not be able to turn a profit on his short sale and would suffer a loss by making his covering purchase in an artificially inflated market. We discuss the merits of such a theory in Part III B, *infra*. At this point, we merely note that if Zlotnick had known of the misrepresentation, it would not have been reasonable for him to rely on the price of the stock as an accurate indication of the stock's value when he made his purchase.

**7.** 806 F.2d at 1160, 1161 n. 10. To the extent that the reasonableness of a presumption turns on its empirical validity, *see LTV*, 88 F.R.D. at 144–45, we note that Zlotnick has introduced no

believed the market price of the stock overvalued Technicom's present earnings and underestimated its potential competition. Given Zlotnick's belief that in January, 1983, the market in Technicom stock did not reflect all available information, we do not find it logical to presume that the market did reflect all available information in March, 1983, when he made his covering purchases.

A presumption that Zlotnick relied on the price of the stock in making his investment decision is also unwarranted. An investor like Zlotnick sells short because he believes the price of a stock overestimates its true value. While it is possible that, when he decided to cover, Zlotnick did rely on the stock's price to determine investment value, this court will not presume such a fundamental change in investment strategy. Similarly, since Zlotnick decided that the market price was not an accurate valuation of the stock at the time of his short sale, we should not presume that it was reasonable for him to rely on the market price at the time of his purchase. We therefore decline to presume that Zlotnick relied on defendant's alleged misrepresentations in deciding to cover his purchase. While we believe that Zlotnick should be allowed to proceed with this action and prove all the necessary facts at trial, he should not be awarded the considerable additional advantage of the presumptions in his favor which he seeks through his analogy to the *Peil* decision.

### B. The Integrity of the Market

Zlotnick argues that, as a short seller, he relied upon the integrity of the market. Though he believed the price of the stock overvalued at the time of the short sale, he relied on the market's ability, given accurate information, to correct its valuation of the stock and set a better price. By falsely inflating the price of the stock, defendants interfered with the market's ability to correct itself. Once he had sold short, Zlotnick was unable to protect himself from this fraud. Therefore, he argues, requiring him to prove individual reliance on de-

relevant empirical evidence on the nature of

fendant's misrepresentations " 'imposes an unreasonable and irrelevant evidentiary burden.' " *Peil,* 806 F.2d at 1160 (quoting *Blackie v. Barrack,* 524 F.2d 891, 907 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976)).

Reliance on the integrity of the *market* in a stock differs from reliance on the integrity of the market *price* in that stock. An investor relying on the integrity of a market price in fact relies on other investors to interpret the relevant data and arrive at a price which, at the time of the transaction, reflects the true worth of the company. By contrast, an investor relying on the integrity of the market relies on the continuing ability of investors to interpret data subsequent to the transaction; he relies on future conditions. In the context of a short sale, the difference between these two types of reliance is more pronounced. The traditional purchaser depends on the "market" to determine a present value for the stock that allows the purchaser an adequate return on his investment. On the other hand, the short seller depends for a return on his investment on the "market" realizing that the value of the stock at the time of the short sale does not allow for an adequate return on the investment. This realization is what drives the price of the stock down and allows the short seller his profit.

More important, reliance on the integrity of the market price is actual, if indirect, reliance. The short seller is not injured because he knew of or depended on the misrepresentation; he is injured because others investing in the stock so relied. The fraud of which Zlotnick complains was truly perpetrated "on the market," and not, even indirectly, on Zlotnick as an investor in the market. We are mindful that reliance is not an abstract requirement in the securities laws: plaintiff must prove reliance in order to prove that the misrepresentation caused actual injury. "Reliance is therefore one aspect of the ubiquitous requirement that losses be causally related to the defendant's wrongful acts." *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 186

short sales.

(3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). Zlotnick may, as discussed above, be able to prove his own actual, indirect reliance upon the market price. However, to the extent Zlotnick argues he is entitled to recover for the reliance of third parties, we reject his claim.

Zlotnick alleges that defendants misrepresented the truth, and that such misrepresentations caused the price of the stock to rise at the time he sold short. He concludes that since the fraudulently-induced rise in the stock caused him to lose money, he is entitled to recover. Under Zlotnick's theory, he would be allowed to recover even if he purchased after deciding, based solely on accurate information, that the stock was not overvalued and his short sale was ill-conceived.[8] Yet, in such a case, Zlotnick is no different from the traditional purchaser who buys at a fraudulently-inflated price but actually relies solely on accurate information in purchasing: both have made bad valuations of the stock, but those valuations were independent of any alleged fraud. Zlotnick cannot recover his loss on his covering purchase unless he shows that his decision to cover was somehow connected with the fraud.

### C. Indirect Reliance

■ That Zlotnick states his claim in terms of reliance on the market's integrity does not preclude the conclusion that a fraudulent market price was a material factor in his decision to cover. Zlotnick might have changed his investment strategy and actually relied on the "integrity" of the inflated market price. The rise in price itself may have changed his opinion of the stock's value. The rise may also have increased his risk of loss beyond acceptable levels, causing him to purchase. It may have led him to conclude that the stock would take so long to decline in value that the cost of maintaining his short position would exceed his potential gain. In *Peil*, this court accepted that a market price which reflects a defendant's misrepresentation may pass that misrepresentation on to potential purchasers. It is only logical to hold that the same price which may communicate a misrepresentation to the traditional investor may also communicate a misrepresentation to the short seller.

Zlotnick is entitled to have this court consider as true both his allegations and all reasonable inferences from those allegations. *Wisniewski, supra*. We find Zlotnick's amended complaint sufficient to support a reasonable inference of actual, if indirect, reliance.[9] Defendants, on the other hand, have not made sufficient proof of either the reason for Zlotnick's decision to cover or the materiality of the price in these circumstances to entitle them to dismissal. We will therefore vacate the District Court's order dismissing the complaint and remand for further proceedings. However, unlike the plaintiff in *Peil*, Zlotnick is not entitled to a presumption at trial that the market price did actually pass defendants' misrepresentations on to him, or that he did actually rely on the inflated market price in making his decision to cover. We hold no more than that Zlotnick is entitled to a chance to prove such actual reliance to a finder of fact.

### IV. THE § 9 AND RICO CLAIMS

The District Court dismissed the § 9 and RICO Act claims based solely on its decision on the § 10(b) claim. The court stated that the § 9 claim failed to allege sufficient reliance for the same reasons as the § 10(b)

---

**8.** Recovery under this theory all but ignores the substantial discretion a short seller exercises in deciding when to cover. This case is therefore distinguishable from "forced sales" situations. *See, e.g., Falls v. Fickling*, 621 F.2d 1362 (5th Cir.1980) (sheriff's sale); *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 381 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) (price for minority shareholders' stock determined according to merger agreement).

**9.** Zlotnick does not allege facts sufficient to establish fraud in his initial decision to sell short. He does not allege misrepresentation of the underlying strength of the business that induced his short sale: false inflation of the company's earnings would discourage his short sale by reducing the price/earnings ratio. Also, false inflation of the market price prior to his short sale would act to increase his potential profit.

claim. The RICO claim was dismissed because the court held that without a violation of § 10(b), the complaint did not allege a predicate offense. Since we hold that Zlotnick is not precluded as a matter of law from stating a claim under § 10(b), we must also vacate the dismissal of these other claims.

## CONCLUSION

For the reasons stated above, this court will vacate the order of the District Court dismissing the complaint, and remand for further proceedings consistent with this opinion.