In re WESTERN UNION
SECURITIES LITIGATION.

Arnold I. LAVEN, on behalf of himself
and all others similarly
situated, Plaintiff,

v.

Robert M. FLANAGAN, Russell W.
McFall, Richard E. Horner, T. Roland
Berner, Charles E. Ehinger, Richard P.
Sprigle, Curtiss–Wright Corporation,
Western Union Corporation, Merrill
Lynch, Pierce, Fenner & Smith Incor-
porated, Defendants.

Gregory John SHEFFIELD, Plaintiff,

v.

Richard E. HORNER, et al.,
Defendants.

David JAROSLAWICZ, on behalf of
himself and all others similarly
situated, Plaintiff,

v.

WESTERN UNION CORPORATION,
Russell W. McFall, Richard E.
Horner, Robert M. Flanagan, Defendants.

Andrew H. SHARPE, on behalf of
himself and all others similarly
situated, Plaintiff,

v.

Robert M. FLANAGAN, Russell W.
McFall, Richard E. Horner, T. Roland
Berner, Charles E. Ehinger, Richard P.
Sprigle, Curtiss–Wright Corporation,
Western Union Corporation, Merrill
Lynch, Pierce, Fenner & Smith Incor-
porated, Defendants.

John A. PIMM, on behalf of himself
and all others similarly
situated, Plaintiff,

v.

Robert M. FLANAGAN, Russell W.
McFall, Richard E. Horner, T. Roland
Berner, Charles E. Ehinger, Richard P.
Sprigle, Curtiss–Wright Corporation,
Western Union Corporation, Merrill

Lynch, Pierce, Fenner & Smith Incor-
porated, Defendants.

Civ. A. Nos. 84–5092, 85–0075, 85–0238,
85–0623 and 85–0624.

United States District Court,
D. New Jersey.

May 24, 1988.

See also, D.C., 695 F.Supp. 800.

John C. Harkins, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant Western Union Corp.

Alexander Kerr, Hoyle, Morris & Kerr, Philadelphia, Pa., for defendants Flanagan, Horner and McFall.

Harold R. Tyler, Jr., Patterson, Belknap, Webb & Tyler, New York City, for defendant Curtiss–Wright Corp. and defendants Berner, Springle, and Ehinger.

E. Michael Bradley, Brown & Wood, New York City, for defendant Merrill, Lynch, Pierce, Fenner & Smith, Inc.

Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, Pa., for plaintiffs.

## OPINION

GERRY, Chief Judge.

This is a civil securities fraud action alleging violations of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, (the "1933 Act" or the "Securities Act") and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, (the "1934 Act" or the "Exchange Act"). Plaintiffs, past and present shareholders of defendant Western Union Corporation, hope to bring a class suit against that corporation, the Curtiss–Wright Corporation, various directors and officers of these companies, and investment bankers Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch").

## I. FACTUAL BACKGROUND

According to plaintiffs' consolidated amended complaint (hereinafter referred to as "the complaint"), defendant Western Union offered for sale to the general public 5,000,000 depository preferred shares pursuant to a registration statement and prospectus effective April 16, 1984, and two prospectus supplements effective April 17 and 27, 1984. One putative class ("Class I") is said to have purchased these shares during the period extending from April 16, 1984, through and including November 27, 1984. A second putative class ("Class II") is averred to have purchased these shares from defendant Merrill Lynch during the

above mentioned period. Plaintiffs state that at least 4,000,000 depository preferred shares were in fact sold to the public pursuant to the issued prospectus; of these, 1,665,000 are said to have been sold by Merrill Lynch. A third putative class ("Class III") is set out as having purchased over 1,000,000 shares of Western Union common stock from March 19, 1984, through and including July 13, 1984.

Plaintiffs Arnold I. Laven, Andrew H. Sharpe, John A. Pimm, Clayton P. Spitz, Fred Kornick, and Friedrich E. Neumann allege violations of Sections 11 and 15 of the Securities Act against all defendants on behalf of themselves and the Class I members. More specifically, they contend that Western Union's prospectus contained untrue statements and omissions of material facts concerning the alleged "serious and devastating financial condition of Western Union" (Complaint, ¶ 105) in violation of Section 11 of the 1933 Act. Many examples of the alleged differences between the true financial health of Western Union and how the company was represented in the prospectus are detailed in the complaint. Once these misrepresentations and omissions were revealed, plaintiffs state, Western Union's depository preferred shares suffered a substantial decline in value, in part due to the company's announcement on November 27, 1984, that it would not pay a dividend on its preferred stock. As lead underwriter of the depository preferred offering, Merrill Lynch is said to have assisted in the preparation of the prospectus in question, and failed to investigate with due diligence the representations contained in the prospectus.

These same representative plaintiffs also charge, on behalf of themselves and all Class II members, that all defendants violated Sections 12(2) and 15 of the Securities Act in the manner set forth above. As seller of a certain portion of depository preferred shares, defendant Merrill Lynch is charged with a violation of Section 12(2) of the 1933 Act. Western Union is said to have aided and abetted this violation, and defendant Curtiss–Wright is averred to be liable as a controlling person under Section 15 of the Securities Act.

Finally, plaintiff David Jaroslawicz asserts claims on behalf of himself and the Class III members against certain defendants for violations of Sections 10(b) and 20 of the Exchange Act of 1934, as well as Rule 10b–5 promulgated under this Act. Defendants are averred to have made false and misleading statements, as well as omissions of material fact, in Western Union's 1983 annual report and in the above mentioned prospectus and registration statement. Certain of these statements/omissions are set out in plaintiffs' complaint. Resulting from these representations, we are told, the market price of Western Union securities was artificially inflated during the "Class III period."

In a stipulation and order dated September 20, 1985, we conditionally certified the following three classes. Class I consists of all persons other than defendants and any relative, subsidiary, officer, director, employee or affiliate of any defendant who purchased Western Union depository preferred shares during the period from April 16, 1984, through and including November 27, 1984, pursuant to Western Union's registration statement and prospectus effective April 16, 1984, and the prospectus supplements effective April 17 and 27, 1984, and who sustained damage as a result of such purchase. This claim is brought pursuant to Section 11 of the Securities Act of 1933. Class II includes all persons who purchased the above shares directly from defendant Merrill Lynch during the above period of time and sustained damage as a result. This claim is brought pursuant to Section 12(2) of the Securities Act. Class III is composed of all persons who purchased Western Union common stock during the period from March 19, 1984, through and including July 13, 1984, and who sustained damage as a result of such purchase. Section 10(b) of the Securities Exchange Act of 1934 is the basis for this class' claim. The order specifically provides that it is conditional in nature, and can be "altered, amended, or vacated as may be warranted by the more fully developed record."

Defendants now move the court to decertify the conditional classes. Both sides also desire a reassessment of the length of the class periods.

## II. LEGAL ANALYSIS

### A. *Certification of Class III Plaintiffs*

Defendants challenge the continued certification of Class III, contending that those plaintiffs fail to meet various requirements set forth in Rule 23 of the Federal Rules of Civil Procedure. Subsection (a) of that rule denotes the following four prerequisites to a class action:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

We begin by analyzing each in turn.

No serious argument is advanced that the class is not so numerous that joinder of all members would be impracticable. Plaintiffs state in the complaint their "belief" that purchases of more than 1,000,000 shares were made by more than 1,000 persons during the Class III class period. As defendants do not take issue with this contention in their submissions, we find that plaintiffs continue to satisfy this prong of Rule 23(a).

The moving parties similarly do not seem to push the argument that there are no questions of law or fact common to this class of plaintiffs, the next step in the Rule 23(a) analysis. Since Class III plaintiffs allege that misrepresentations and/or omissions artificially inflated the price of the Western Union common stock which they purchased, clearly there are at least some common questions of law or fact among these plaintiffs, and we accordingly find that plaintiffs continue to meet this requirement of subsection (2).

### 1. *Typicality of Claims*

Defendants strongly contend, however, that the representative of Class III, David Jaroslawicz, does not have claims or defenses typical of those of the class, and that he is incapable of fairly and adequately protecting the interests of his class, thus falling afoul of Rule 23(a)(3) and (4).[1] Specifically, defendants argue that Jaroslawicz's claims are not typical of the class he is said to represent because is a far more sophisticated investor than the members of Class III, and further that he purchased some of his Western Union common stock after publication of Western Union's 1983 annual report, which listed a net loss before extraordinary items for that year of $59.1 million. That purchase was around $16½ per share; Jaroslawicz had purchased shares of this stock in December of 1983 and January of 1984 at around $36–$39 per share. (Jaroslawicz Deposition at 61). Defendants argue that plaintiff read the annual report (Jaroslawicz appears to think he did read it. Jaroslawicz Dep. at 68–69), and obviously was aware of the lower price of the shares when he bought more stock during the Class III period. Accordingly, we are told, this casts doubt on Jaroslawicz's reliance on the integrity of the market in making his purchases, and thus cuts against the typicality of his claims and those of the class he seeks to continue representing. Put simply, defendants appear to argue that the members of Class III claim to have relied on the integrity of the market when they bought their shares, but that Jaroslawicz specifically relied on the materials that had been issued by Western Union. Plaintiff, however, denies ever having seen the prospectus and supplements here at issue. (*Id.* at 68). He does, however, state that he carefully read unnamed documents sent to him by Western Union in order to satisfy himself of the financial health of the company before he bought more of its common stock in July of 1984. (*Id.* at 61–62).

---

**1.** Rhoda S. Abrams, who is named in the complaint as a representative of all Class III plaintiffs along with Jaroslawicz, withdrew as a named plaintiff on January 13, 1988. Jaroslawicz is now the sole representative of the Class III plaintiffs.

We reject defendants' argument that the claims of Jaroslawicz and the remaining members of Class III are not typical. The third court of plaintiff's complaint sets out several allegations of misrepresentations and omissions purportedly made by various of the defendants which are said to have affected the integrity of the market in Western Union securities and artificially inflated or maintained the price of this stock (Complaint, ¶ 130). Class III plaintiffs are said to have "relied, directly or indirectly, on the misrepresentations and misleading statements alleged ... and/or on the integrity of the market for Western Union securities." (*Id.*, ¶ 131). Typical does not mean identical for the purposes of Rule 23(a)(3). Analysis of typicality focuses on whether "the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.), *cert. denied sub nom., Wasserstrom v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985), *citing Weiss v. York Hospital*, 745 F.2d 786, 809 n. 36 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). Certainly, the types of reliance in which the members of Class III engaged might differ to some extent, but we hardly think that such differences are here fatal. As Judge Brotman astutely noted in *In Re Data Access Systems Securities Litigation*, 103 F.R.D. 130, 139 (D.N. J.1984), *rev'd on other grounds*, 843 F.2d 1537 (3d Cir.1988) (en banc), differing types of reliance are present in almost every securities class action, and if this were enough to defeat class action certification on typicality grounds there could never be a class action of securities purchasers. Even if, as defendants here seem to allude, they might be able to show non-reliance by Jaroslawicz—that, in fact, he ignored information that existed in the marketplace—this would go to the merits of the case and cannot be considered by the court on a certification motion. *Id., citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–178, 94 S.Ct. 2140, 2152–2153, 40 L.Ed.2d

732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.") More on this point later. Finally, even the determination of whether individual reliance will be a necessary element of the plaintiffs' claim or whether plaintiffs will be able to benefit from the presumptive reliance of the fraud-on-the-market theory is itself a question that is common to and typical of the entire class. *Data Access Systems*, 103 F.R.D. at 140.

Plaintiffs' allegations in count three of their complaint are fairly straight-forward. Plaintiffs charge that the defendants conspired in a scheme to induce Class III members to purchase Western Union common stock on the basis of misleading statements and/or omissions over a set period of time, in violation of Sections 10(b) and 20 of the 1934 Act, and Rule 10b–5. The sources of the alleged misrepresentations are described in the complaint. Primary among these was Western Union's 1983 annual report, in addition to the prospectus materials. What plaintiffs appear to allege, then, is that certain statements, uniformly available to the plaintiff class, were either relied on by the plaintiffs, or affected the market price of Western Union common stock which was then itself relied on by the plaintiffs when they purchased the newly issued shares. This indicates to us that the claims of Jaroslawicz and his class are typical, all arising out of the same set of alleged misrepresentations and/or omissions.

The case before us appears markedly different from *Seiler v. E.F. Hutton & Co., Inc.*, 102 F.R.D. 880 (D.N.J.1984), where most of the alleged misrepresentations made to the plaintiff class were oral, with different brokers giving different clients different information. In such a case, the purportedly faulty information might well differ drastically. We have been presented with little evidence, however, that the same is true here. We also have been presented with scant evidence indicating that Jaroslawicz is seriously vulnerable to defenses

unique to his situation. Conclusory allegations that he might have ignored information in the marketplace will not suffice. We find that Jaroslawicz's claims are typical of those of the other Class III plaintiffs, meeting the requirement of Rule 23(a)(3).

### 2. Adequacy of Representation

■ Defendants next contend that Jaroslawicz will not fairly and adequately protect the interests of the Class III plaintiffs, as he must under Rule 23(a)(4). Two factors need to be met to fulfill the requirement of this subsection: (1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) plaintiff must not have interests antagonistic to those of the class. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The Third Circuit reaffirmed in *Lewis v. Curtis,* 671 F.2d 779, 789 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982), that subsection (a)(4) requires no more than this, although there may also exist the requirement that the named plaintiff and his attorneys "competently, responsibly, and vigorously prosecute the suit." *See Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

■ Defendants make no claim that the plaintiffs' attorneys are unable to conduct the instant litigation, and we know of no reason to think otherwise. Turning now to Jaroslawicz himself, defendants attack his competency on several levels. Defendants point out that Jaroslawicz is a New York attorney who has previously been a named plaintiff in at least two securities class actions, and that his attorney in this case had represented him in one of these earlier suits. Defendants also note that Jaroslawicz and his current attorney have referred work to each other in the past. Jaroslawicz is thus said to be "too available" in such actions, having no "legitimate interest" in this litigation. Defendants further charge that the named plaintiff's credibility is suspect, since there is a question of whether he saw a copy of one of the complaints

filed in this matter before or after he answered defendants' first set of interrogatories.

We fail to see how any of the above, even if true, in any way shows Jaroslawicz's interests to be antagonistic to those of the Class III plaintiffs. This is the second prong of the *Wetzel* test, *supra.* If he is indeed experienced in class securities litigation, it appears he would be a prime candidate to undertake the vigorous prosecution of this suit—one of the concerns voiced by the *Bogosian* court, *supra.* His sophistication, as defendants would like to have us accept in arguing against the typicality of his claims, would appear to serve him well as a class representative. Defendants, however, appear instead to argue that Jaroslawicz is really ignorant of the true nature of *this* litigation since there are questions as to the time he first became aware of the contents of the complaint. The court is unsure as to which position defendants are here advancing, but we feel both must fail. Even plaintiffs completely ignorant of the facts concerning the transactions they have challenged in class securities actions have been held to be adequate representatives, *see, e.g., Lewis,* 671 F.2d at 789, and the trend in many courts appears to be toward assessing the adequacy of the representative's attorney rather than the personal qualifications of the named plaintiff. *See, e.g., Klein v. A.G. Becker Paribas, Inc.,* 109 F.R.D. 646, 651 (S.D.N.Y. 1986) ("ordinary" investor). We do not, however, feel Jaroslawicz fits into this category. He is an attorney, and a reading of his deposition indicates that he has a good understanding of several of the issues at stake in this litigation, and that he would, together with his attorney, effectively advance them in court. We are certainly not convinced that he has interests antagonistic to those of the class he represents, and hence we find that the strictures of *Wetzel, supra,* have here been met. Jaroslawicz will be permitted to continue as representative of the Class III plaintiffs, the defendants having failed to meet their burden of proving his representation to be inadequate.

### 3. *Maintainability*

Having passed on the prerequisites of a class action, we now turn to consider whether the action is maintainable, pursuant to Rule 23(b). Since our conditional order of September 20, 1985, is concerned only with subsection (b)(3) of the rule, and because all involved parties appear to agree that the focus of this part of the analysis should be on that segment of Rule 23, we will move directly to a consideration if it.

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, as we found above that they were, and in addition

> ... the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Defendants strongly urge upon the court the position that Class III plaintiffs have failed to show that common questions of law or fact predominate over questions affecting only individual members. More precisely, defendants contend that individual questions of the Class III members' reliance on the alleged misrepresentations of the defendants far outweigh common questions of law or fact that may exist.

■ Since the Ninth Circuit's important decision in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), if not before, it has been well-understood that in securities fraud class actions brought under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, proof of subjective reliance on particular misrepresentations is unnecessary to establish a 10b–5 claim for a deception inflating the price of stock traded in the open market. *Id.* at 906, *citations omitted.* Noting that the reliance requirement exists to demonstrate the causal connection between the defendant's wrongdoing and the plaintiff's loss, the court wrote that "causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance." *Id.* In an efficient market, where the price of a company's stock is determined by the available material information regarding the company and its business, such misrepresentations are said to artificially inflate the market price of the offered securities, and hence reliance on the market price is conceptually indistinguishable from reliance upon representations made in face-to-face transactions. Note, *The Fraud-On-the-Market Theory,* 95 Harv.L.Rev. 1143, 1154 (1982). This theory is especially useful in the class action context, since by eliminating issues of individual reliance, it facilitates class action recovery of claims that would otherwise be too small to be litigated individually. *Id.* at 1159. In fact, a strong argument exists that only if such class actions are allowed to proceed will underinclusive recoveries and hence a failure to deter fraud at its inception be avoided. *Id.*

The Third Circuit recently accepted this approach, holding in *Peil v. Speiser,* 806 F.2d 1154, 1161 (3d Cir.1986), that if plaintiffs show that defendants made material misrepresentations, reliance will be presumed. Defendants, of course, would be permitted to attempt to rebut this presumption. Most importantly, the Supreme Court passed on this issue barely two months ago, favorably citing *Peil, supra,* several times. In *Basic, Inc. v. Levinson,* —— U.S. ——, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988), the Court specifically held that since "most publicly available information is reflected in market price, an investor's reliance on any public material misrepresen-

tations ... may be presumed for purposes of a Rule 10b–5 action." The Court also made clear, however, that a defendant may rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id.*

Defendants here disingenuously argue that the Supreme Court in *Basic* did not really compel the acceptance of presumptive reliance, but merely declined to disapprove it. Hairsplitting of such laser-thin precision strikes us as unconvincing, especially in light of the Court's strong language in the *Basic* opinion discussing the need for a fraud-on-the-market theory, *see generally Basic*, 108 S.Ct. at 988–992, and its several favorable citations to the Third Circuit's opinion in *Peil, supra.* Lacking, too, we find defendants' reliance on *Zlotnick v. TIE Communications*, 836 F.2d 818 (3d Cir.1988). While *Zlotnick* can arguably be seen as a cutting-back on the potential scope of *Peil,* we find its validity somewhat questionable in light of *Basic, supra.* Not only is *Basic* a later opinion of a superior court, it also makes several positive references to *Peil, supra,* the scope of which *Zlotnick* arguably constricts. But even if *Zlotnick* remains in full force, we find that it does not assist the defendants' cause. In the first instance, it is factually inapposite. *Zlotnick* concerned a short sale of stock, where the point of selling a stock is that the seller believes the price of that stock overestimates its true value, *i.e.,* that the market price is *not* an accurate valuation. Such is hardly the case in the instant action, where plaintiffs charge in part that they *did* rely on the market price when purchasing their stock to reflect its actual value. Second, *Zlotnick* can really be seen as an example of a defendant able to rebut the presumption of reliance, although the court there saw it as plaintiff's

failure to show he was entitled to the presumption of reliance.

█ Class III plaintiffs allege both actual reliance on the alleged misrepresentations made in Western Union's 1983 annual report and prospectus, and a general reliance on the integrity of the market price, said to be artificially inflated. Because the vast bulk of alleged misrepresentations resulted from the same printed materials, the accuracy of these materials is certainly a question common to all Class III plaintiffs. The fact that there may exist several documents spread out over a period of time on which plaintiffs may have actually relied is not fatal to class certification. A class of stock purchasers allegedly defrauded over a period of time by similar misrepresentations is "united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Blackie*, 524 F.2d at 902. Insofar as Class III plaintiffs make allegations of reliance on the integrity of the market, we find, for the reasons discussed earlier, that plaintiffs are entitled to a preliminary presumption of reliance. We say "preliminary" since in one sense we are really in an early procedural phase in this litigation— the determination of the certifiability of plaintiff classes. The true merits of the action can be considered only insofar as they are tied up in our Rule 23 analysis. *See Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed. 2d 351 (1978); *Nelson v. United States Steel Corp.,* 709 F.2d 675, 679 (11th Cir. 1983); *compare Eisen,* 417 U.S. at 178, 94 S.Ct. at 2152. Plaintiffs aver various examples of misstatements and omissions in their complaint, many, if not all, of them material in the sense that had plaintiffs been informed of the true state of affairs these statements purported to address, they might well have decided against purchasing Western Union common stock. If true, these material misrepresentations entitle the plaintiffs to a presumption of reliance under *Basic, supra.*

Defendants argue in the alternative, however, that they have rebutted any such presumption of reliance. To this end, they state that during the period of alleged misrepresentation in Western Union's prospectus and annual report, the company released other, accurate information about ongoing changes in the various production markets in which Western Union conducted its business. (Defendants' Reply Brief at 7–8). The moving parties also argue that the true state of the company and the markets in which it interacted was being reported by the national media. (*Id.;* Defendants' Brief at 46–48). As a result, we are told, accurate information existed in the marketplace about Western Union, and the plaintiffs were exposed to this information in the media.

We find this argument incredible, especially since it almost appears to concede that Western Union's annual report and prospectus were misleading. Putting this curious aspect aside, we nevertheless find the argument without merit. Even if some curative information were available to the public, that would not eliminate the alleged misrepresentations that had also been disseminated. That inaccurate information could certainly have played a role in setting an artificial market price. Furthermore, the true issue here involved is whether false statements or misleading omissions were made by the defendants in contravention of federal securities law. It is unreasonable to charge prospective stock purchasers with access to every bit of information which could have some impact on their decision. This is even less reasonable to expect where the offering company has sent out materials purporting to fairly describe it to potential investors. Finally, acceptance of defendants' argument would send a message to corporations and others that they need not be bound by the disclosure requirements of the federal securities laws as long as they disseminate *some* accurate information to the market, or perhaps even if such information otherwise exists. Such a position would controvert the purposes behind Rule 10b–5, and we refuse to adopt such a stance here. For all of these reasons, we find that the Class III plaintiffs have shown that common questions predominate over individual ones for Rule 23(b)(3) purposes.

Finally, there is no real contention that the class mechanism is not superior to other available methods for the fair and efficient adjudication of this dispute. In fact, as has been already noted, the class action is an ideal way to ensure private enforcement of the federal securities laws, since individual suits would most times be prohibitively expensive.

In sum, Class III will continue to be certified pursuant to Rule 23, and Jaroslawicz will be permitted to remain as class representative.

### B. *Certification of Class I and II Plaintiffs*

Defendants also challenge the continued certification of Classes I and II on the grounds that the representatives of those classes lack typicality and are otherwise inadequate class representatives. Since no other arguments in opposition to the continued certification of Classes I and II are advanced here by the defendants, only the issues of typicality and adequacy will be addressed.

#### 1. *Typicality of Claims*

We reject defendants' contention that the representatives of both Classes I and II—plaintiffs Laven, Sharpe, Pimm, Spitz, Kornick and Neumann—possess claims or defenses different from those of the class as a whole. Indeed, defendants themselves appear to have abandoned a good deal of this position in their reply brief and in oral argument. Defendants had at first argued that the claims of the named representatives were atypical to those of the class as a whole, since some are said to have relied on oral representations from their stockbrokers rather than the purportedly misleading prospectus or the integrity of the market. Whatever the truth of these assertions, we find them irrelevant. Class I and II plaintiffs bring suit under Sections 11, 12(2) and 15 of the Securities Act. On their face, these provisions make it unlawful to issue a registra-

tion statement (Section 11) or a prospectus (Section 12(2)) which contains an untrue statement of material fact or omits to state a material fact necessary to make existing statements not misleading. It is the issuance of such documents which is unlawful, by itself; no requirement of reliance is evident from the face of the statute (Section 15 merely provides for the liability of controlling persons), and various courts have properly held that proof of such reliance is unnecessary. *See, e.g., Data Access Systems,* 103 F.R.D. at 146; *Lewis v. Goldsmith,* 95 F.R.D. 15, 23 (D.N.J.1982), regarding Section 11, and *Sanders v. John Nuveen & Co., Inc.,* 619 F.2d 1222, 1225 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981), *citing other circuits,* regarding Section 12(2). No evidence has been presented to us which might indicate that Western Union made available an earnings statement covering a period of at least twelve months beginning after the effective date of the registration statement, thus injecting a reliance requirement into Section 11(a), or that defendant stock issuers *did not know* of the alleged misrepresentations. We thus find the claims of all the Class I and II plaintiffs to meet the typicality requirement of Rule 23(a)(3).

## 2. *Adequacy of Representation*

It is the adequacy of representation requirement, then, that remains to be considered in defendants' opposition to Classes I and II. As has been earlier set out, all that is needed in the Third Circuit to meet the requirements of subsection (a)(4) is a qualified attorney, the lack of antagonistic interests between the representatives and the remainder of the class, and vigorous prosecution by both named plaintiffs and their attorney. *See Wetzel* and *Bogosian, supra.* As before, no serious allegations are made about the competence of plaintiffs' attorneys or about counsels' intent to vigorously prosecute this action—in part evidenced by their spirited opposition to defendants' instant motion. That leaves the issue of antagonistic interests and vigorous prosecution on the part of the named plaintiffs.

We do not find any of the named representatives of Classes I and II to have interests antagonistic to the remainder of the class. Defendants advance a hodgepodge of arguments against all the representatives, and we find it difficult to find a coherent theory behind defendants' scattershot approach. Were the full scope and ramifications of defendants' arguments consistently accepted by the courts, we would be surprised indeed if any suit ever were certified as a class action.

The fact that Sharpe, Pimm, Spitz and Kornick may have relied on the oral representations of their brokers and not on the materials issued by Western Union when they bought the preferred shares at issue for Class I and II plaintiffs is irrelevant for the reasons set out above. Sections 11, 12(2) and 15 are geared toward combating the evil of misrepresentations in documents related to the issuance of securities; how potential investors get wind of the misinformation—if they do at all—does nothing to advance this end.

Defendants next argue against Sharpe and Laven's representation because it appears that these two plaintiffs still retain their stock in Western Union, and hence, we are told, their interests may conflict with those of class members who have sold their stock and have sustained actual damage. The court does not see the fact that certain of the representative plaintiffs still own shares of Western Union as fatal to the issue of the adequacy of their representation. As Judge Debevoise perceptively noted in *Lewis,* 95 F.R.D. at 21, rejecting a similar contention that the sole plaintiff's continued ownership of some number of the shares there in dispute created a conflict of interest since plaintiff arguably had a financial interest in minimizing the size of any settlement or judgment in order to minimize the impact upon the market price of his shares: "[t]he majority of cases ... recognize that in virtually all securities actions of this nature there will be class members who have sold shares and some who have retained them, and have not found the conflict created to be sufficiently serious to defeat the certification of a

class[,]" *citing Blackie supra,* and *Herbst v. International Telephone & Telegraph Co.,* 495 F.2d 1308 (2d Cir.1974), and *rejecting Wood v. Rex–Noreco, Inc.,* 61 F.R.D. 669 (S.D.N.Y.1973), a case on which the defendants specifically rely.

The court agrees with this approach. It is wrong to contend that Sharpe and Laven have not sustained damage from Western Union's alleged misrepresentations; the value of the shares they now hold has plummeted from where it stood when these plaintiffs purchased their shares, and it would be wicked indeed to expect them to take a large actual loss just to enable them to prosecute the alleged cause of that loss. This is especially so in light of Sections 11 and 12(2)'s focus on the wrongdoer. Furthermore, all of the preferred stock plaintiffs tender their depository shares upon return of the consideration paid plus interest. (Complaint, ¶ 114). If their suit is successful, then, plaintiffs do not expect to retain whatever shares they may still own, making the ultimate value of these shares unimportant.

■ Defendants' argument that plaintiff Neumann should be dismissed as a representative because he is suing on behalf of a trust is similarly without merit. Their contention that he may be subject to a unique defense of breach of his fiduciary duty to his trust beneficiaries is both totally speculative and does not explain how that defense would be raised by these defendants in these proceedings. We also find unpersuasive various minor points made by defendants against all of the named class representatives. Being unconvinced that any of these plaintiffs have interests antagonistic to the remaining members of Classes I and II, or that they plan on pursuing a strategy other than that of vigorous prosecution of the class claims, the above discussed plaintiffs will be permitted to continue in their representation of the Class I and II members.

### C. Length of Class Periods

Lastly, we must consider the length of the class periods. As currently constituted, Classes I and II extend from the date of Western Union's registration statement and prospectus, effective April 16, 1984, until November 27, 1984, the date Western Union announced it was eliminating dividends on the preferred stock it issued in accordance with this prospectus and its subsequent two supplements. The period encompassed by Class III extends from March 19, 1984, the date on which former class representative Abrams purchased her shares of Western Union common stock, through July 13, 1984, the date on which Jaroslawicz was initially thought to have purchased his common shares. (It appears, however, that Jaroslawicz may have purchased his shares as late as July 18, 1984.)

Defendants contend that the period of time for Classes I and II should end somewhere around July or August of 1984, earlier than it currently does. The reason, as best we understand it, is said to be that there was a "continuous stream" of information about Western Union being injected into the market after the release of the April prospectus, and that this causes a sharp divergence in securities law claims available to those purchasing before and after the disclosure of such information. (Defendants' Brief at 44–45). As an example, defendants list Western Union's July 18, 1984, announcement of its plan to reduce its main subsidiary's work force by as much as ten percent, an event said to have been "widely reported" by the media. (*Id.* at 46). On July 25, 1984, Western Union is said to have reported a $2.983 million second-quarter loss. (*Id.*) Other news of changing market conditions is said to have received considerable media exposure in August of that year. (*Id.* at 47–48; *see also* Defendants' Reply Brief at 29–33). According to defendants, this information "directly contradict[s] claims of nondisclosure raised by plaintiffs in their complaint" demonstrating "the changing nature of plaintiffs' alleged nondisclosure issues." (*Id.* at 48).

■ The court finds defendants' approach on this issue to be flawed. As earlier discussed, claims brought pursuant to Sections 11 and 12(2) of the Securities Act of 1933 need not, in most instances,

concern themselves with issues of reliance on the part of the plaintiffs. Yet that is just to what defendants' position here amounts: Classes I and II should be constricted because purportedly curative information was available somewhere in the market that could or should have tipped off some or all of the class plaintiffs to the true state of Western Union's troubles. It strikes us, however, that the determination of the relevance and possible effects of this information on the misrepresentations allegedly made by Western Union in April of 1984 is an issue that should be left to the fact finder at trial; passing on it here would be premature. We do not deny that in certifying a class, a court should strive to tailor the expanse of the class period to comport as well as is then ascertainable to the specific facts underlying the plaintiffs' theory of recovery. We feel that in this instance, November 27, 1984, is the appropriate ending point for Classes I and II. On that date, Western Union announced that contrary to its April 1984 prospectus, no dividends would be paid on the preferred shares that had been issued at that time. This information was a stark indicator that there could very well be something woefully wrong with both Western Union and the prospectus and registration statement the company had issued some months ago. We have been presented with no evidence indicating that at any time Western Union specifically addressed and repaired that earlier information which plaintiffs are here challenging as violating Sections 11 and 12(2) of the 1933 Act. Given that fact, we are left with a situation where a serious question remains as to the weight to be accorded the information said to be available to investors in July and August of 1984, and we see this as an issue that can only be properly resolved at trial. Seen against the above backdrop, November 27, 1984, the date Western Union announced it was cancelling dividends on the preferred shares, is the appropriate ending date for Classes I and II.

██ Finally, taking advantage of defendants' re-opening of the class certification issue, plaintiffs' urge the court to extend the Class III period from July 13, 1984, to November 27, 1984. According to plaintiffs, discovery in this matter has unearthed "massive accounting fraud" resulting in "hundreds of millions of dollars of bogus or inflated 'assets' shown on Western Union's balance sheet and a systematic overstatement of the company's earnings[.]" (Plaintiffs' Brief at 63–64). The investing public had no inkling of these facts prior to Western Union's November 27, 1984, announcement, we are told, and so the Class III period should be extended to that date.

It is far too late to attempt to inject an issue of accounting fraud in this manner into this litigation. Plaintiffs commit barely a page of their brief to this issue, did not advance it at oral argument, and we have far too little before us to enable us to consider using information supplied this late to alter the time period of a class existing since 1985. Whatever the merits of this claim, we are confident they will be fully and fairly resolved in *the companion case* that has been filed in this court, *Laven v. Price Waterhouse*, Civil No. 88–0380.

### D. *Notice to Classes*

██ One final matter needs to be addressed at this time. Since we are certifying these classes to proceed pursuant to Fed.R.Civ.P. 23(b)(2), subsection (c)(2) of the rule comes into play. That part of Rule 23 provides for the court to direct to the members of the class "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." No such notice has yet been dispensed, and we feel it is high time to inform the plaintiff classes that they are involved in securities litigation. To this end, we will require all parties to agree upon a form of notice within sixty days of the entry of our order in this matter. This form of notice is to be submitted to the court for approval by the end of that sixty day period.

In sum, our order of September 20, 1985, will remain unchanged. All motions to alter it will be denied. The parties will be required to submit to the court a proposed

form of notice to be sent to the members of the three plaintiff classes.

An appropriate order has been entered.