**In re PHILLIPS PETROLEUM SECURITIES LITIGATION.**

**Civ. A. No. Misc. 85–75 MMS.**

United States District Court,
D. Delaware.

May 25, 1990.

Joseph A. Rosenthal of Morris, Rosenthal, Monhait & Gross, William Prickett of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del. (Wolf Popper Ross Wolf & Jones, New York City, Kohn, Savett,

Klein & Graf, P.C., Philadelphia, Pa., Milberg Weiss Bershad Specthrie & Lerach, New York City, Bizar, D'Alessandro, Shustak & Martin, New York City, of counsel), for plaintiffs.

Charles F. Richards, Jr., William J. Wade and Thomas A. Beck of Richards, Layton & Finger, Wilmington, Del., for Mesa defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This opinion resolves defendants' renewed summary judgment motion arising out of the announcement of a proposed hostile tender offer for Phillips Petroleum ("Phillips") led by Mesa Partners [1] (the "Partnership"). The Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982) and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1988); a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1982); and claims arising under Delaware state law.[2] The named defendants include the Partnership and those individuals that comprise the Partnership.[3]

In *In re Phillips Petroleum Securities Litigation*, 697 F.Supp. 1344 (D.Del.1988), this Court granted summary judgment in favor of the defendants on all the issues raised in the summary judgment motions, dismissing with prejudice all outstanding claims against the defendants.[4] The Third

Circuit appellate court vacated in part and affirmed in part. The appellate court vacated the district court's judgment dismissing the claims under Section 10(b) and Rule 10b–5 finding that Plaintiffs had adduced sufficient evidence of scienter to preclude summary judgment, and remanded for further proceedings on those claims. In addition, the appellate court vacated the district court's judgment dismissing the Plaintiffs' claims under the RICO statute which had been predicated upon the dismissal of the Section 10(b) and Rule 10b–5 violations, and remanded for further proceedings. The appellate court affirmed the district court's dismissal of all claims brought under Delaware state law.

Mesa Defendants' renewed motion for summary judgment raises three primary issues. First, whether the Partners' equal basis statements were material misstatements which proximately caused Plaintiffs' claimed damage. Second, whether the record supports a finding of primary liability, aider and abettor liability or control person liability under Section 20 of the Exchange Act for any of the individual Mesa Defendants. Finally, whether the acts alleged by Plaintiffs constitute a pattern as required by the RICO statute.

Summary judgment will be denied on the following issues—materiality, causation, primary liability, aider and abettor liability and control person liability. Summary judgment will be granted to Defendants on plaintiffs' RICO claim.

1. Mesa Partners, at all times relevant hereto, was a general partnership consisting of three general partners: Mesa Asset Co., a wholly owned subsidiary of Mesa Petroleum Co.; Cy–7, Inc.; and Jack–7, Inc.

2. The parties treat the Amended Complaint as having been filed and served. Indeed, the answer was served and the first summary judgment argument was held and an appeal from the Court's decision was based on the supposition that these parties treated the complaint attached to the motion for leave to file an amended complaint as the complaint. Although, the Amended Complaint was never actually filed, the Court will treat the record as though it was properly filed.

3. The named defendants remaining in this litigation are the Partnership, Mesa Petroleum Co.

("Mesa"), Mesa Asset Co., Cy–7, Inc., Jack–7, Inc., T. Boone Pickens, Jr., Chairman and CEO of Mesa Petroleum Co., and a Mesa Asset Co. director; Cyril Wagner, Jr., sole owner of Cy–7, Inc. and a Mesa Petroleum Co. director; Jack E. Brown, sole owner of Jack–7, Inc.; I.T. Corley, Controller and Secretary of Mesa Petroleum Co., and Secretary of Mesa Asset Co.; J.R. Walsh, Jr., Robert L. Stillwell, Harley N. Hotchkiss, Wales H. Madden, Jr., David H. Batchelder, and Jesse P. Johnson (directors of Mesa Petroleum Co.).

4. The complex procedural history of this litigation is set forth in the district court opinion. *See In re Phillips Petroleum Securities Litigation*, 697 F.Supp. 1344 (D.Del.1988).

# I. STATEMENT OF THE FACTS

The Partnership began to purchase Phillips common stock on October 22, 1984 ostensibly for investment purposes. The purchases continued through early December. On December 4, 1984, the Partnership formally announced in a press release its decision to commence a tender offer for 15 million shares of Phillips common stock at $60 per share conditioned upon receiving necessary financing. The press release stated the Partnership had acquired approximately 5.7% of the Phillips outstanding shares. Additionally, the Partnership stated explicitly in its press release that it would "not sell any Phillips shares owned by it back to Phillips except on an equal basis with all other stockholders." The Partnership's filing of its Schedule 13–D on December 5, 1984 noted that the proposed tender offer was ultimately designed to obtain control of Phillips. The Schedule 13–D also expressly stated the Partnership did not intend to sell its shares to Phillips except on an equal basis with all shareholders. Pickens affirmed the contents of the Schedule 13–D on a nationally televised newscast by stating the Partnership would only sell its Phillips shares to Phillips if all shareholders received the same offer. The Partnership never amended its Schedule 13–D to indicate it was no longer seeking to ensure all shareholders were treated on an equal basis.

Phillips initially countered the hostile tender offer with two separate strategies, namely, settlement discussions with the Partnership and pursuit of a legal defense in the Delaware Chancery Court. On Friday, December 21, 1984 at 5:30 p.m. EDT, Phillips and the Partnership met once again to negotiate the terms of a possible settlement offer. On December 23, 1984, Phillips and the Partnership reached an agreement.

The agreement first provided for a recapitalization plan whereby Phillips would reclassify (pro rata for shareholders) 38% of its common stock into preferred stock to be exchanged for debt in the principal amount of $60 per share. Second, Phillips would create an employee incentive stock owner-ship plan to which it would sell no more than 32 million newly issued shares at market value. Phillips also was required to purchase at least $1 billion of its common stock in open market transactions following the exchange.

If the shareholders approved that recapitalization plan, the Partnership was required to sell its shares to Phillips for $53 per share before completion of the recapitalization. If the shareholders did not approve the recapitalization, the Partnership had several options. First, it was given a put giving it the right to sell all shares to Phillips at the same $53 per share. Second, it retained the right to keep its Phillips shares subject to a standstill agreement. Finally, it reserved the right to sell its Phillips shares to a third party. Ultimately, in early March 1985, Phillips announced that its shareholders had rejected the recapitalization plan. On March 6, the Partnership exercised its put and sold its shares to Phillips for $53 per share on March 11, 1985.

# II. DISCUSSION

## A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

When the movant has carried its burden under Rule 56(e), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both *genuine* and *material.* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A dispute over facts is "material" if, under the substantive law, it would affect the outcome of the suit. *Id.*

at 248, 106 S.Ct. at 2510. A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-movant. *Id.*

The burden of proof also plays a role in deciding summary judgment motions. Summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The "very mission" of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R. Civ.P. 56 advisory committee note to the 1963 Amendment. If wisely applied, the summary judgment procedure will eliminate useless trials. 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* § 56.02[1] (1988). However, summary judgment is not a substitute for trial and should not be used as a shortcut to avoid trial when a genuine issue of material fact remains in dispute.

The standard for summary judgment is similar to that for a directed verdict. *Anderson v. Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12 ("In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). This does not mean, however, that the court in deciding a motion for summary judgment may weigh the evidence. The court should not grant summary judgment merely because it believes the movant will prevail at trial. Nor should the court grant summary judgment in the belief that a jury verdict for the non-movant at trial would be set aside as against the weight of the

evidence. *See* 6 J. Moore & J. Wicker, *supra* at § 56.15[6]. Furthermore, the court should not grant summary judgment unless it is reasonably certain that judgment may be justly rendered without a trial. *Id.*

Defendants contend that based on the undisputed record they are entitled to summary judgment on the 10(b) and 10b–5 violation, individual liability, and the RICO violation. Each of these contentions will be discussed below.

B. *Section 10(b) and Rule 10b–5 Liability*

i. *Generally*

■ The Defendants have moved for summary judgment on the Section 10(b) and Rule 10b–5 violations contending that the equal basis representations were not material and that the misrepresentations did not proximately cause Plaintiffs' injury. The purpose of Section 10(b) and Rule 10b–5 is to protect the persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be. Section 13–D "was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing." *GAF Corp. v. Milstein*, 453 F.2d 709, 720 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972).

■ In order to establish a claim under Section 10(b) and Rule 10b–5, the Plaintiff must prove that the Defendants i) made misstatements or omissions; ii) of material fact; iii) with scienter; iv) in connection with the purchase or sale of securities; v) upon which the Plaintiff relied; and vi) that reliance proximately caused the Plaintiff's injury. *See In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1244 (3d Cir.1989). Plaintiffs allege that the Defendants violated Section 10(b) and Rule 10b–5

by issuing the December 4, 1984, press release and filing their Schedule 13–D on December 5, 1984, containing the "equal basis" statements. The Third Circuit appellate court found a triable issue of fact with respect to the Partnership's scienter which precluded summary judgment. The issues remaining in Defendants' renewed summary judgment motion on the Section 10(b) and Rule 10b–5 claims are: (1) whether the equal basis statements were material and (2) whether the those statements proximately caused the Plaintiffs' injury.

### ii. *Materiality*

■ The issue of materiality is a mixed question of fact and law, involving the application of the legal standard to the particular set of facts. "The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). The general standard of materiality in a proxy-solicitation context was set forth in *TSC Industries* as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132. That standard of materiality was expressly extended to Section 10(b) and Rule 10b–5 cases by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

■ The determination of materiality depends upon a balancing of both the probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity. *See id.* at 232–36, 108 S.Ct. at 982–86. "Only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law." *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 641 (3d Cir.1989).

■ The controversy in this case arises from a challenge by shareholders who purchased stock in Phillips Petroleum based on the December 4, 1984, press release and the Schedule 13–D filed on December 5, 1984, both of which contained "equal basis" representations. Further, Plaintiffs challenge the additional equal basis representation made by Pickens on December 6, 1984, when he appeared on the MacNeil/Lehrer News Hour to discuss the tender offer for Phillips. In response to direct questions regarding a possible buy back, Pickens responded that "[t]he only way we would consider selling back the company is if they made the same offer to all stockholders." Applying the TSC Industries standard, the question is whether it is substantially likely that the equal basis statements would have assumed actual significance to a reasonable investor contemplating the purchase of securities.

Defendants contend that under this standard, the equal basis statements are immaterial as a matter of law based on the Third Circuit appellate court decision *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236 (3d Cir.1989). The Defendants contend that in affirming this Court's judgment and analysis on the state law claims, the Third Circuit appellate court found that the Plaintiffs had produced "no probative evidence of reliance." *Id.* at 1250. The appellate court continued that "even if they had, reliance upon a mere expression of future intention cannot be 'reasonable,' because such expressions do not constitute a

sufficiently definite promise." *Id.* Defendants argue that a reasonable shareholder could not have relied upon the equal basis statements since those statements were representations of future intent and therefore necessarily subject to change as the tender offer situation progressed.

Similarly, Defendants contend that the Third Circuit appellate court indicated the statements were immaterial in finding that the increased trading was "as easily attributable to the simple fact that a takeover fight for Phillips was beginning—along with a consequent bidding war for Phillips stock—as to specific reliance by individual shareholders on the equal basis statements." *Id.* at 1250 n. 18. The appellate court stated with respect to Plaintiffs' promissory estoppel claim that "reliance upon a mere expression of future intention cannot be "reasonable," because such expressions do not constitute a sufficiently definite promise." *Id.* at 1250. Defendants argue from the foregoing quoted and other similar language that the Third Circuit appellate court has effectively held that the equal basis statements are immaterial as a matter of law.

In addition, Defendants urge that the record in this case established that the equal basis statements were such a small part of the Partnership's announcement of the $60 per share tender offer that those statements could not be viewed as material. Defendants contend the equal basis statements were made to fulfill the Partnership's disclosure obligations under Item 4 of Schedule 13–D, and that the equal basis statements were not intended to cause any investors to purchase Phillips shares by dispelling wariness on their part. Defendants assert that this contention is supported by Plaintiffs' focus on the proposed $60 tender offer as the measure of their damages which underscores the fact that the shareholders were concerned with the tender offer proposed rather than that equal basis statements.

Plaintiffs argue that Defendants' contention is "based upon a tortured interpretation of the Third Circuit's holding regarding Plaintiffs' promissory estoppel cause of action." (Dkt. 151 at 23–24). "The role of the materiality requirement is not to attribute to investors a child-like simplicity, an inability to grasp the probabilistic significance of negotiations, but to filter out essentially useless information that a reasonable investor would not consider significant ... in making his investment decision." *Basic,* 485 U.S. at 234, 108 S.Ct. at 985 (citations omitted). Plaintiffs argue that Defendants' analysis based on the appellate court's conclusion that the equal basis representations were not a "sufficiently definite promise," *In re Phillips Petroleum Securities Litigation,* 881 F.2d at 1250, in the context of promissory estoppel, is irrelevant to the determination of the materiality of the statement under the Federal Securities laws.

Further, Plaintiffs assert that it is not disputed that the equal basis disclosures were mandated by the Schedule 13–D filing requirements and argue that "[d]isclosures mandated by law are presumably material." *Craftmatic Securities Litigation,* 890 F.2d at 641 n. 17. In addition, the Third Circuit appellate court stated that:

> ... such unequivocal statements [as the equal basis statements] presented an obvious danger of misleading the public— because they can fairly be read as a statement by the Partnership that, no matter what happened, it would not change its intentions.

*In re Phillips Petroleum Securities Litigation,* 881 F.2d at 1246. Plaintiffs argue that the equal basis statements must be material since a reasonable shareholder could not be misled by an insignificant statement.

Plaintiffs also contend that Defendants' intent in making the equal basis representations is irrelevant to the determination of what would be material to the reasonable investor. Plaintiffs urge that in light of Defendants' reputation as a greenmailer, it was the equal basis representations that gave credence to the tender offer. Plaintiffs contend that, despite his comments to the contrary, Pickens and the Mesa Defendants were perceived to be greenmailers. Plaintiffs note that nearly every newspaper

or magazine article written about Pickens mentions greenmail. Indeed, Plaintiffs argue that arbitragers jumped into the takeover attempt "only after Boone Pickens said it would not be 'greenmail'." (Dkt. 151, Appendix C, Business Week, *Finding The Bucks Buried in Corporate Debris*, July 9, 1984, at 92). Plaintiffs note that other courts have also discussed the history of Mesa as a "corporate raider with a national reputation as a greenmailer." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 956 (Del.Supr.1985).[5] In addition, Plaintiffs note that the deposition of Albert I. Edelman, the class representative, reflects actual significance of the equal basis statements in his deliberations. *See* Edelman Deposition. (Dkt. 151A, Exhibit M). In light of this reputation, Plaintiffs argue that the equal basis representations "would have assumed actual significance in the deliberations of a reasonable shareholder" and thus would be material.

The task of determining whether a given omission or misstatement is material is especially difficult when the Plaintiff alleges nondisclosure or misstatements of "subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts." *Craftmatic Securities Litigation*, 890 F.2d at 642. In *Basic*, the Supreme Court considered whether the failure to disclose preliminary merger discussions was a material omission. According to the Court, the materiality of preliminary merger discussions should depend on the facts and involves the balancing of both the probability the event will occur and the anticipated magnitude of the event. *Basic*, 485 U.S. at 238–39, 108 S.Ct. at 991–92.

In this case, the Schedule 13–D affirmatively represented the intention of the Mesa Defendants to sell to the company only on an equal basis with the other shareholders. Likewise, the one-page press release contained explicit reference to the equal basis statements and further, in the MacNeil/Lehrer New Hour interview, Pickens referred to and explained the meaning of the equal basis representations to the stockholders of Phillips Petroleum. Although, Defendants argue that the Plaintiffs essentially ignore the announcement of the takeover in focusing solely on the equal basis statements, the fact that Defendants included the equal basis statements in the one page highlights of the press release combined with the fact that Pickens specifically referred to and explained the meaning of the equal basis statements on MacNeil/Lehrer News Hour at least provides colorable inferences that the statements were material.

In this case, the present record provides sufficient evidence of materiality to defeat Defendants' application for summary judgment. The Court finds that the equal basis statements were made by the Mesa Defen-

---

**5.** Although the *Unocal* decision was decided after the Phillips takeover attempt, and therefore would not have affected investors' decision to buy Phillips, the characterization of the Mesa Defendants is applicable in that there is substantial overlap between the parties in that case and the parties in Phillips and the reputation of the Mesa Partners in February—April 1985 significantly correlates to the reputation of the Mesa Partners in December 1984. Similarly, in a memorandum opinion, the District Court for the Central District of California found with respect to a preliminary injunction hearing that:

> [I]t is well known, the Mesa entities are dealmakers which have targeted six oil companies for acquisition in the past three years and in none of these cases has Mesa remained a passive investor.

> \* \* \* \* \* \*

> [T]he Court [found] with respect to Mesa II's intent that Mesa II from the outset intended

to put Unocal "in play" and thereby either obtain control or "greenmail" the corporation in exchange for dropping its bid. Given this intent, it is clear that the initial Schedule 13D and the first two amendments violated the statute.

(C.A. No. 85–2179 (April 26, 1985, Unocal Corporation, Plaintiff, v. T. Boone Pickens, Jr., Jack E. Brown, Cyril Wagner, Jr., Wagner & Brown, Mesa Petroleum Co., Mesa Southern Co., Mesa Asset Co., CY–41, Inc., Jack–41, Inc., Mesa Partners II, Defendants, Mesa Partners II, Counterclaimant, v. Unocal Corporation, Counterdefendant, Dkt. 151A, Exhibit R at 430a–33a.)

dants to disclose their intent regarding the acquisition and disposition of their Phillips Petroleum shares as required by the Schedule 13–D and that the Mesa Defendants specifically highlighted the equal basis statements in the December 4, 1984 Press Release and the December 6, 1984 Mac-Neil/Lehrer News Hour interview. In addition, the Court finds that the present record would allow a reasonable trier of fact to conclude that the Mesa Partnership had a reputation for greenmail. Thus, the Court concludes that there is sufficient evidence to create a question of fact as to whether the reasonable investor would have considered the equal basis statements material in relation to the attempted takeover of Phillips Petroleum by the Mesa Defendants.

### iii. *Causation*

Defendants argue that although the fraud on the market theory relieves Plaintiffs of the burden of establishing transaction causation, it does not relieve Plaintiffs of the burden of establishing loss causation. Defendants urge that transaction causation is but "one aspect of the ubiquitous requirement that losses be causally related to the defendant's wrongful acts." *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 186 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *see also Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) (appellant required to establish loss causation where a presumption of reliance established transaction causation).

In a non-fraud on the market theory case, a Section 10(b) plaintiff must show both that he relied on the material misrepresentations and that this reliance proximately caused the injury. Establishing reliance merely proves that the plaintiff was induced to act by the defendant's conduct. In order to satisfy the causation element, the plaintiff must prove both "transaction causation," that the defendants' misrepresentations caused the plaintiff to make the investment, and "loss causation," that the misrepresentations were

the cause of the loss. *See Bruschi v. Brown,* 876 F.2d 1526, 1530 (11th Cir.1989). To establish loss causation, the "plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1985). Thus, even though the defendant's misconduct induces the plaintiff to make the investment, if the particular loss complained of is caused by supervening general market forces or other factors unrelated to the defendant's misconduct that operate to reduce the value of the plaintiff's securities, the plaintiff is precluded from recovery. The plaintiff need not show that defendants' misrepresentations were the exclusive cause of the injury, but only that it was a significant contributing cause. *See Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 (2d Cir.1981). However, plaintiff may recover only if the misrepresentations touch upon the reasons for the investment's decline in value.

Defendants argue that the fraud on the market theory only affords a presumption of reliance or transaction causation. Defendants cite numerous appellate court decisions that support the proposition that loss causation is an element of a Section 10(b) and Rule 10b–5 claim in addition to the element of transaction causation. *See Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d at 380; *LHLC Corp. v. Cluett, Peabody & Co., Inc.,* 842 F.2d 928, 931 (7th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988); *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 773 (9th Cir.1984); *Currie v. Cayman Resources Corp.,* 835 F.2d 780, 785 (11th Cir. 1988). However, the extension of the fraud on the market theory to Rule 10b–5 claims is relatively recent and none of the decisions Defendants' cited is based on a fraud on the market theory as in this case. Moreover, the Court is unable to identify an appellate decision which required a find-

ing of loss causation in a case based on a fraud on the market theory.

 Contrary to the Defendants' urging, the Third Circuit appellate court presumes reliance, both transaction causation and loss causation, so long as the Plaintiffs can prove that the misrepresentation or omission was both material and that it was disseminated in a well developed and open market transaction. *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986). If the harm suffered is a result of the misstatement, the fraud on the market theory operates to relax the distinctions of the traditional concepts of reliance, materiality and causation, thereby reducing the evidentiary burden on the Rule 10b–5 plaintiff who has traded in an open and impersonal market.

The requirement of positive proof of reliance has been replaced by a rebuttable presumption of reliance where the plaintiff can establish that the Defendant effected a material misrepresentation on an impersonal and efficient market. Thus, where the fraud occurred in "[t]he modern securities markets, literally involving millions of shares changing hands daily, ... our understanding of Rule 10b–5's reliance requirement [is relaxed to] encompass these differences." *Basic*, 485 U.S. at 244, 108 S.Ct. at 989–90 (footnotes omitted). In such a case, "the market is performing a substantial part of the valuation process performed by the investor ... [and] acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price." *Id.* (quoting *In re LTV Securities Litigation*, 88 F.R.D. 134, 143 (N.D.Tex.1980)).

In an open and developed securities market, the court "will presume that the [defendant's material] misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock." *Peil*, 806 F.2d at 1161. By allowing investors to invoke the theory of "fraud on the market", the courts alleviate the difficulties of proving individual reliance on the misrepresentations. "Indeed, nearly every court that has considered the proposition has concluded that

where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Basic*, 485 U.S. at 247, 108 S.Ct. at 993.

The fraud on the market theory suggests that injury results from nondisclosure or misrepresentation of material information that affects the price of the stock in the market, the equilibrium price. The underlying basis for the fraud on the market concept is the efficient markets hypothesis which asserts that in any actively traded stock the stock market price accurately reflects all currently available information about the value. The market operates to continually re-adjust the market price of the stock based on new information.

The theory assumes that the market efficiently assimilates information about securities and adjusts the market price of a security to properly reflect the publicly available information. A fraud on the market is any deceit that successfully disseminates false or misleading information into the securities market or withholds vital information from the market. Such a deceit will defraud investors even if the investors were unaware of the misrepresentations or omissions that affected the market price, because investors rely on the integrity of the market price. Thus, where material misrepresentations or omissions have been disseminated into an active securities market, the reliance of individual plaintiffs may be presumed under the fraud on the market theory.

The Defendants' fraud on the market creates a threefold presumption of indirect reliance. First, the court presumes that the misrepresentation affected the market price. Second, it presumes that a purchaser did in fact rely on the price of the stock as an indication of its value and thereby relied on the misrepresentation in the purchase. Third, it presumes the reasonableness of that reliance. *Zlotnick v. TIE Communications*, 836 F.2d 818, 822 (3d Cir.1988). The combination of the materiality of the misstatement with the presump-

tion of indirect reliance, allows the court to assume that at least a portion of the plaintiffs' economic injury resulted from the defendant's misrepresentations. A defendant may rebut this presumption by showing that the market did not respond to the misrepresentation, that the price difference was not a result of the fraud, that the plaintiff knew the representation was false, or that plaintiff would have made the purchase regardless of the undisclosed information. *Id. See also Blackie v. Barrack,* 524 F.2d 891, 906–07 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

The Mesa Defendants argue that there is no connection between the equal basis statements and the damages alleged by the Plaintiffs which would allow the conclusion that the alleged misrepresentations in any way caused the injury. Defendants contend that Plaintiffs' focus on the December 24 price drop as a measure of damages, *i.e.,* the proposed $60 tender offer in relation to the $45.25 closing price of the stock following announcement of the Buy Back Agreement, supports Defendants' assertion that Plaintiffs' injury resulted from the withdrawal of the tender offer.[6] Defendants argue that the equal basis statements relate only to the Partnership's sale of its Phillips shares back to Phillips on March 11, 1985, and thus could not proximately have caused the December 24 price drop.

In addition, Defendants contend that the decision of the Partnership to sell its shares back to Phillips was not known until March 6. The Agreement provided that if the stockholders defeated Recapitalization, the Partnership had the right, but not the obligation, to sell its shares to Phillips. The Partnership still had the option to sell its shares to some third party without breaching the language of the equal basis statements. Therefore, Defendants argue that the drop in market price that occurred on December 24 could not have been the market reacting to the alleged falsity of the equal basis statements, which had not been proven false. Rather, the market was reacting to the standstill agreement which precluded the Partnership from commencing any tender offer.

Plaintiffs contend that Defendants mischaracterize the damages requested. In Count I, the Plaintiffs claim that "[a]s a consequence of the [equal basis representations] . . ., the market price of Phillips common stock was artificially inflated during the class period. . . . Had Plaintiffs and other members of the class known the truth, they would not have purchased the Phillips common stock at the inflated prices they paid." (Dkt. 151 at 49). The "out-of-pocket" damages are defined as "the difference between what the [buyer paid] for his stock and what he would have [paid] had there been no fraudulent conduct." *Sharp v. Coopers & Lybrand,* 649 F.2d at 190 (citations omitted); *Harris v. Union Elec. Co.,* 787 F.2d 355, 368 (8th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986). "[C]onsidering the situation from a damage viewpoint, the fraud resulting in an initial inflated price for the security is at least partially responsible for the investor's economic injury." *In re Washington Public Power Supply System Securities Litigation,* 650 F.Supp. 1346, 1353 (W.D.Wash.1986), *aff'd,* 823 F.2d 1349 (9th Cir.1987).

In this case, the Defendants' equal basis representations were made in an open and well developed securities market. Therefore under the fraud on the market theory, the Plaintiffs are presumed to have relied on those misrepresentations in the purchase of the Phillips securities. The record in this case indicates that the price of Phillips stock did rise after the Schedule 13–D disclosure which indicated the Mesa Defendants' intention with respect to Phillips and contained the equal basis representations.

In addition, the Plaintiffs have established for purposes of Defendants' summary judgment motion that the Defendants had a reputation as corporate raiders and

---

**6.** Although Plaintiffs' response to the Defendants' Contention Interrogatories did not indicate the specific theories of recovery, the Court did allow the Plaintiffs to formally amend the Interrogatory answer in light of the prior decisions limiting recovery. (*See* Dkt. 154 at 62).

that the equal basis statements alleviated concern with respect to the Defendants' intent to "greenmail" Phillips Petroleum. The equal basis misrepresentations were material in that the statements indicated, contrary to public opinion, the intent of the Defendants in this transaction not to engage in greenmail. Those statements induced the purchase of Phillips stock and allegedly inflated the market price fraudulently. Thus, a reasonable trier of fact could conclude that Plaintiffs were injured to the extent the price paid differed from the true value of the stock when it was purchased, *see Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 980 (E.D.N.Y.1988), and that although a part of the loss might be attributable to the withdrawal of the tender offer, the initial injury and some part, or all, of the drop in price can be attributed to the artificial inflation in the purchase price resulting from the equal basis representations.

On the summary judgment record, the Court finds a jury could determine that the equal basis statements induced the Plaintiffs to enter into the market by misrepresenting the intention of the Defendants, and further that as a result of the Defendants' misrepresentations the market price of Phillips Petroleum was artificially inflated and conclude that the Plaintiffs are entitled to recovery those "out-of-pocket damages". In addition, a jury could conclude that the Mesa Defendants have not rebutted the presumption the market price inflation reflected a rise in price occasioned by the alleged material misstatements. It follows and the Court holds that Plaintiffs have adduced enough evidence to preclude summary judgment on the issue of causation.

### C. *Individual Liability*

Plaintiffs contend that Mesa Asset Co., CY-7, Inc. and Jack-7, Inc. (the partners of the Mesa Partners), Mesa Petroleum Co., I.T. Corley and T. Boone Pickens are each primarily liable for violating Rule 10b-5. In addition, a number of the individual Mesa defendants are alleged to be secondarily liable as aiders and abettors of Mesa Partners: T. Boone Pickens, David H. Bat-

chelder, Jack E. Brown, Cyril Wagner, Jr., Robert L. Stillwell and I.T. Corley. Likewise, each of the Mesa defendants is alleged to be a controlling person under Section 20(a): the individual director defendants of Mesa Partners and the general partners of Mesa Partners, *i.e.*, Mesa Petroleum, Mesa Asset Co., Cy-7, Inc., and Jack-7, Inc., and their sole stockholders and directors. "Defendants do not contest that the Partnership would be primarily liable for any violation of Rule 10b-5 and that a triable issue of fact may exist as to the secondary liability of Messrs. Pickens and Batchelder." (Dkt. 149 at 27). These issues will be addressed in turn.

### i. *Primary Liability*

■ To establish primary liability, Plaintiffs must establish each element of a Section 10(b) or Rule 10b-5 violation as to that individual or entity. Plaintiff must prove that each Defendant "i) made misstatements or omissions; ii) of material fact; iii) with scienter; iv) in connection with the purchase or sale of securities; v) upon which the Plaintiff relied; and vi) that reliance proximately caused the Plaintiff's injury." *In re Phillips Petroleum Securities Litigation*, 881 F.2d at 1244. Plaintiffs allege primary liability as to the general partners of Mesa Partners; Mesa Petroleum, the parent corporation of the managing partner of Mesa Partners; and individual defendants Pickens and Corley who each personally participated in making the equal basis representations.

### 1. General Partners: Mesa Asset Co., Cy-7, Inc. and Jack-7, Inc.

■ It is well established that under the law of partnerships, knowledge and actions of one partner are imputed to all others. *See Engl v. Berg*, 511 F.Supp. 1146 (E.D.Pa.1981). The partnership is liable for acts performed in its name and within the scope of its business, and the partners are liable for all debts and obligations of the partnership. The partner's liability extends to any acts or omissions which occurred while a partner. Thus, the fraudulent misrepresentations of one partner in the course of partnership business

will be imputed to all other partners. Plaintiffs contend that as general partners of Mesa Partners, Mesa Asset Co., Jack–7, Inc. and Cy–7, Inc. are jointly and severally liable for all claims against the Partnership.

Defendants contend that Cy–7, Inc. and Jack–7, Inc. cannot be liable, primarily or secondarily, because on March 5, 1985, the day before the Partnership "put" its shares back to Phillips, Cy–7, Inc. and Jack–7, Inc. assigned all their Phillips shares to Mesa Southern. Therefore, Defendants argue that those individuals have not violated the terms of the equal basis statements. Cy–7, Inc. and Jack–7, Inc. did not sell their shares back to Phillips, but rather to Mesa Southern, a sister corporation to Mesa Asset Co.

Plaintiffs argue that the potential liability of all the general partners attached when the equal basis misrepresentations were made, *i.e.*, December 1984. Because the equal basis representations were allegedly reckless and fraudulent when made, the sale five months later does not mitigate the liability of either Cy–7, Inc. or Jack–7, Inc.

On this record, the Court finds that a reasonable trier of fact could determine that the equal basis statements were made on behalf of the Partnership and that the loss caused by those statements, *i.e.*, the artificially inflated purchase price of the Phillips stock, occurred while Cy–7, Inc. and Jack–7, Inc. were general partners of the Partnership. Thus, the Court concludes that the Plaintiffs have adduced sufficient evidence to preclude summary judgment as to primary liability with respect to Mesa Asset Co., Cy–7, Inc. and Jack–7, Inc.

### 2. Mesa Petroleum

Plaintiffs contend that Mesa Petroleum should be held primarily liable for the securities violations of the Mesa Partnership in that Mesa Petroleum dominated Mesa Asset Co. and viewed Mesa Asset Co. as merely a vehicle through which Mesa Petroleum could participate in the purchase of Phillips Petroleum. (*See* Minutes of Special Meeting of Board of Directors of Mesa Petroleum Co. December 4, 1984,

Dkt. 151A, Exhibit Q). Mesa Petroleum owned all of the stock of Mesa Asset Co. and provided 100 percent of Mesa Asset Co.'s capitalization. The president of Mesa Petroleum Co. was also the President of Mesa Asset Co. and the two companies shared two common directors, David H. Batchelder and Jesse P. Johnson. Further, Batchelder and Corley were, respectively, vice-president and secretary, of both Mesa Petroleum Co. and Mesa Asset Co. In addition, the Schedule 13–D describes Mesa Asset Co.'s principle business "to act as a general partner of the Partnership and to hold other investments." (*See* Schedule 13–D, Dkt. 151A, Exhibit C at 157a). Through Mesa Asset, Mesa Petroleum contributed $1.6 billion to the partnership while Jack–7, Inc. and Cy–7, Inc. each contributed $100 million, with Mesa Asset Co. named the managing partner. Based on the above facts, Plaintiffs contend that the corporate veil should be pierced to hold Mesa Petroleum Co. liable.

The courts of Delaware do not easily pierce the corporate veil. The corporate entity may be disregarded "only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or equitable considerations among members of the corporation require it, are involved." *Pauley Petroleum, Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del.Supr.1968) (citations omitted). The separate corporate existence will not be set aside merely on a showing of common management or whole ownership.

"The Delaware courts have also stated, although not held, that the corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent." *Mabon, Nugent & Co., et al. v. Texas American Energy Corp.*, Del.Ch. C.A. No. 8578, Berger, V.C. (April 12, 1990). "A subsidiary corporation may be deemed the alter ego of its corporate parent where there is a lack of attention to corporate formalities, such as where the assets of the two entities are commingled, and their operations intertwined. An alter ego relationship might also lie where a corporate parent exercises complete domi-

nation and control over its subsidiary." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 267 (D.Del.1989). "The alter ego theory allows the court to ignore technical differences between two corporations where the second corporation was created merely to avoid the effect of ... laws." *Mobil Oil*, 718 F.Supp. at 269 (quoting *American Bell Inc. v. Federation of Telephone Workers of Pennsylvania*, 736 F.2d 879, 889 (3d Cir.1984)).

In this case, a reasonable trier of fact could determine that Mesa Petroleum formed Mesa Asset Co. for the purpose of participating in the Phillips Petroleum takeover attempt. In addition, a jury could determine that by virtue of the direct participation by the directors of Mesa Petroleum in directing the hostile takeover, Mesa Petroleum did so dominate the actions of Mesa Asset Co., and hence Mesa Partners, to reduce their actions to a merely mechanical response, thereby creating Mesa Asset Co. as merely an alter ego of the parent corporation, Mesa Petroleum. In light of the nature of the specific allegations relating to an intent to deceive and perpetrate a fraud on the market, the Court concludes summary judgment is precluded because a trier of fact could conclude that Mesa Asset Co. was merely an alter ego for Mesa Petroleum created to insulate the parent corporation from possible securities fraud liability.

### 3. Individual Primary Liability

Plaintiffs allege individual primary liability as to Defendants I.T. Corley and T. Boone Pickens, Jr. During the relevant time period, Corley was the Controller and Secretary of Mesa Petroleum, as well as the Secretary of both Mesa Asset Co. and Mesa Southern. Plaintiffs allege primary liability for Corley based on his signature on the Schedule 13–D following the statement:

> After reasonable inquiry and to the best of its knowledge and belief, each of the undersigned certifies that the information set forth in this statement is with respect to it true, complete and correct.

(*See* Dkt. 151A, Exhibit C at 156a). Plaintiffs argue that a reasonable jury could conclude that Corley was a participant in the promulgation of the equal basis misrepresentations and is therefore primarily liable for such representation.

Defendants contend that there is no evidence that Corley participated in the making or dissemination of the equal basis statements, nor any duty which would form the basis of primary liability under 10b–5 based on his signature of the Schedule 13–D.

The Court finds that a reasonable trier of fact could determine that Corley did sign the form and certify that it was true, and that such signature represented his acceptance as true the contents of that 13–D statement. In addition, the signature of Corley lent credibility to the 13–D. Thus, the Court concludes that Plaintiffs have adduced enough evidence to preclude summary judgment as to the primary violation of I.T. Corley.

In addition, Plaintiffs contend that T. Boone Pickens was the President and Chairman of the Board of Directors of Mesa Petroleum, as well as President of both Mesa Asset Co. and Mesa Southern during the relevant time period. Pickens is personally quoted with respect to the equal basis statements in both the New York Times Article and the MacNeil/Lehrer News Hour. In the New York Times Article "he said that neither he nor his partners would sell any shares back to Phillips, 'except on an equal basis with all other stockholders.'" (*See* Dkt. 151A, Exhibit B). On the MacNeil/Lehrer News Hour, Pickens responded to a question relating to a possible buy back that "[t]he only way we would consider selling back the company is if they made the same offer to all stockholders." (Dkt. 151A, Exhibit E at 169a). Plaintiffs contend that these statements reaffirmed the intent of the Mesa Partners with respect to the equal basis representations and are subject to the securities laws. Thus, Plaintiffs argue that Pickens is personally liable for violation of Section 10(b) and Rule 10b–5.

The Court finds that a reasonable trier of fact could determine that the representations by Pickens as to the intent of the

Partnership did bolster the credibility of the equal basis representations because of his personal reputation both as an investor and as a central figure in both Mesa Petroleum and Mesa Asset Co. Thus, the Court concludes that Plaintiffs have adduced sufficient evidence to preclude summary judgment as to the primary violation of Pickens.

### ii. *Secondary Liability*

Plaintiffs allege secondary liability under two theories. First, Plaintiffs contend that Pickens, Batchelder, Brown, Wagner, Stillwell and Corley each aided and abetted the Partnership's violation of the securities laws. In addition, Plaintiffs allege that each of the individual defendants had the power to control or influence the Partnership within the meaning of Section 20(a), 15 U.S.C. § 78t(a), and thus is secondarily liable for the Partnerships misrepresentations.

### 1. Aiding and Abetting Liability

■ In order to establish aiding and abetting liability, Plaintiffs must prove:

1. The existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;

2. knowledge of this violation on the part of the aider and abettor; and

3. substantial assistance by the aider and abettor in the achievement of the primary violation.

*Hill v. Equitable Bank, Nat. Ass'n,* 599 F.Supp. 1062, 1083 (D.Del.1984). Plaintiffs assert that on October 17, 1984, Pickens, Batchelder and another Mesa employee named Tassin met with Wagner and Brown. As a result of that meeting, Mesa Partners was formed and Phillips Petroleum was selected as the target. Plaintiffs contend that the equal basis representation had its genesis in these early meetings between Pickens, Batchelder, Wagner, and Brown and argue that these four individuals should be held as aiders and abettors stemming from the formulation of the fraudulent scheme.

In addition, Plaintiffs claim that Pickens was the spearhead of Mesa Petroleum and served as the spokesperson for that group and its subsidiaries. Plaintiffs contend that Pickens aided and abetted the dissemi-

nation of the equal basis statements through personal statements both in the newspapers and in his appearance on the MacNeil/Lehrer News Hour. In addition, Plaintiffs claim that both Stillwell and Batchelder assisted in and supervised the drafting of both the December 4, 1984 Press Release and the December 5, 1984 Schedule 13–D which contained the fraudulent misrepresentations. Similarly, the Plaintiffs allege that Corley's signature on that Schedule 13–D aided the Partnership's fraudulent scheme by endorsing the misrepresentations as the Partnership's intent.

Plaintiffs assert that the standstill agreement between Phillips and the Partnership required Brown, Wagner and Pickens to each sign in their individual capacity in addition to signatures on behalf of the corporations, *i.e.,* Cy–7, Inc., Jack–7, Inc. and Brown & Wagner. (*See* Dkt. 151A, Exhibit K at 176a–77a). Thus, Plaintiffs contend that through their signatures on the standstill agreement, these three individuals aided the Mesa Partners in breaching its equal basis obligation.

Defendants assert that aider and abettor liability is improper in that the record is devoid of evidence that the individual defendants had any awareness of improper activity or that they knowingly advanced any misrepresentations. *See In re Action Industries Tender Offer,* 572 F.Supp. 846, 853 (E.D.Va.1983).

The Court finds that a reasonable trier of fact could determine that each of the individuals alleged to have aided and abetted the Partnership's fraudulent misrepresentations was an active player in the takeover attempt and rendered substantial assistance to the success of the fraudulent scheme. In addition, the record indicates that each of these individuals was present at a number of the meetings in which a jury could determine that the takeover strategy of Phillips Petroleum would have been formulated. The Court finds that the record would allow a reasonable trier of fact to infer that each of these individuals had direct knowledge and gave substantial assistance to the improper activity of the Partnership. As a consequence, the Court

concludes that the Plaintiffs have adduced enough evidence to preclude summary judgment as to aider and abettor liability of Pickens, Batchelder, Brown, Wagner, Stillwell and Corley.

### 2. Controlling Persons Liability

 Section 20(a) of the Exchange Act imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws. Section 20(a), 15 U.S.C. § 78t(a), provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

To state a claim that the individual defendants were "controlling persons" plaintiffs must establish that: 1) the individual defendants had the power to control or influence the primary violators; and 2) the individual defendants were culpable participants in the illegal activity. *See Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984). To establish control person liability, the plaintiff must show that the defendant had actual power or influence over the allegedly controlled person. "Actual control means the practical ability to direct the actions of [the controlled person]." *Epstein v. Haas Securities Corp.*, 731 F.Supp. 1166, 1174 n. 5 (S.D.N.Y.1990) (citations omitted).

Plaintiffs allege that each of the Mesa Defendants is liable under Section 20(a) in that each individual culpably participated in the Partnership's unlawful activity. Plaintiffs urge that where, as here, the corporate officers are a narrowly defined group charged with the day-to-day operations of the corporation, it is reasonable to presume that these officers had the power to control or influence the decisions and actions of the corporation. In addition, Plaintiffs contend that from the record which establishes that these individuals were at meetings in which the strategy for the Phillips takeover was determined, it can be inferred that these individuals had direct knowledge and input into the decision to make the equal basis representations. Thus, Plaintiffs argue that in this case, given the small number of directors, Section 20(a) liability can be imposed on the officers and directors of Mesa Petroleum plus Brown and Wagner as the officers and directors of the additional general partners in Mesa Partners. In addition, Plaintiffs assert control person liability for the corporate entities: Mesa Petroleum Co., Mesa Asset Co., Cy–7, Inc., and Jack–7, Inc. in that each of these corporate entities was directly involved in the management of the Partnership and through the individual Mesa Defendants determined the strategy for the Partnership's attempted takeover of Phillips.

Defendants contend that section 20(a) did not intend everyone to be an insurer against fraud. Rather, there must be some showing of actual participation in the activities which are alleged to violate the securities laws. *See Burgess v. Premier Corp.*, 727 F.2d at 832. Defendants argue that the minutes of the meetings show no mention of the equal basis representations such that knowledge of the fraudulent activity cannot be established in this case.

 The Court finds that although ordinarily, the status or position of an alleged controlling person, by itself, is insufficient to presume or warrant a finding of power to control or influence, in this case a reasonable trier of fact could infer that this small group of officers and directors did have the power to control the direction of the Phillips takeover. In addition, the Court finds that in this case the alleged corporate fraud was accomplished through the dissemination of false and misleading information as conveyed in the Schedule 13–D and press releases which it is reasonable to presume, in this case, were the collective actions of the Mesa Defendants. It follows that Plaintiffs have established sufficient evidence to preclude summary judgment as to the control liability of the Mesa Defendants.

842

## D. *RICO Violation*

■ In order to establish a RICO violation, the Plaintiffs must prove four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Defendants contend Plaintiffs have failed to allege a pattern of racketeering activity. The Third Circuit appellate court in *Barticheck v. Fidelity Union Bank/First Nat. State,* 832 F.2d 36, 39 (3d Cir.1987), has developed a six factor analysis in determining whether a "pattern of racketeering" exists. These factors are: "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Id.* at 39. The *Barticheck* Court noted that no one factor is dispositive and held that these factors should to be applied on a case-by-case basis.

Recently, in *H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (citing *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d 36 (3d Cir.1987)), the Supreme Court interpreted RICO's pattern requirement. The *H.J. Inc.* Court reaffirmed that in order "to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* 109 S.Ct. at 2900 (emphasis in original). Predicate acts are related if they have "'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* at 2901, *quoting* 18 U.S.C. § 3575(e). Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 2902. To satisfy the continuity element, a plaintiff must show that "the predicates themselves amount to, or ... otherwise constitute a threat of, *continuing* racketeering activity." *Id.* at 2901 (emphasis in original). "Predicate acts extending

over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* at 2902.

The *H.J. Inc.* Court stressed that Congress had a "more natural and common-sense approach to RICO's pattern element in mind," *Id.* at 2899, and that the "limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance...." *Id.* at 2902. In that case, the Supreme Court reversed the dismissal of plaintiffs' complaint which alleged "that at different times over the course of at least a 6–year period the noncommissioner respondents gave five members of the [Minnesota Public Utilities Commission] numerous bribes, in several different forms, with the objective ... of causing these Commissioners to approve unfair and unreasonable rates for Northwestern Bell." *Id.* at 2906.

In consideration of the foregoing policy, this circuit interpreted the continuity requirement as an "important constraining role in the operation of the RICO statute." *Marshall–Silver Const. Co., Inc. v. Mendel,* 894 F.2d 593, 596 (3d Cir.1990) (following the Fourth Circuit's analysis in *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 683 (4th Cir.1989)). The Third Circuit appellate court reasoned that "[v]irtually every garden-variety fraud is accomplished through a series of ... acts that are 'related' by purpose and are spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we ... think it unlikely that Congress intended RICO to apply in the absence of a more significant societal threat." *Marshall–Silver Const. Co., Inc.,* 894 F.2d at 597 (dismissing the RICO claim where the alleged acts occurred on only three occasions within a five day period with no threat of long-term criminal conduct).

Plaintiffs allege in their Amended Complaint that the Defendants multiple acts of securities, mail and wire fraud by filing,

mailing, transmitting and publishing the December 4, 1984 Press Release and the Schedule 13–D and amendments thereto demonstrate a pattern of racketeering activity. Plaintiffs did not list in the Amended Complaint as predicate acts other transactions which would demonstrate that filing of false Schedule 13–Ds were part and parcel of the Partnership's or any individual defendant's regular way of doing business (presumably permitting them to obtain an advantage such as engaging in greenmail). At oral argument, the Court recognized that the Amended Complaint had been filed prior to and without the benefit of the Supreme Court's opinion in *H.J. Inc. v. Northwestern Bell Telephone Company, supra.* After advising Plaintiff that failure to allege other allegedly false Schedule 13–Ds as predicate acts in the RICO count of the complaint would result in dismissal of that count (Dkt. 154 at 84), the Court afforded plaintiffs 10 days in which to advise whether they wished to amend their complaint. (*Id.* at 85). By letter dated March 5, 1990, Plaintiffs advised they declined to amend the RICO claim. (*See* Dkt. 158).

Defendants contend that the alleged predicate acts concern a short period of time, and that the only repetition cited by the Plaintiffs refers to the fact that the Partnership allegedly made numerous amendments to the Schedule 13–D without correcting the equal basis representations. Thus, Defendants argue that Plaintiffs cannot satisfy the continuity plus relationship test as required by the Supreme Court in *H.J. Inc.*

It is clear that Plaintiffs unamended complaint fails to demonstrate a cognizable RICO claim under the current Supreme Court test. At most, Plaintiffs allege a time period spanning less than three weeks, December 4 through December 21. Further, the predicate acts all relate to the failed takeover attempt of Phillips Petroleum with no indication of future criminal conduct. Plaintiffs complaint is what the Supreme Court had in mind when it emphasized that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the

continuity] requirement ..." *H.J. Inc.*, 109 S.Ct. at 2902. Therefore, Defendants' motion for summary judgment on the RICO claim will be granted.

## III. CONCLUSION

An order will be entered granting summary judgment in part and denying summary judgment in part. The order will grant summary judgment to Defendants on the RICO claim. The order will deny summary judgment to Defendants on the issues of materiality, causation, primary liability, aider and abettor liability and control person liability.